Good morning. My name is John Nyman. I'm here representing Sorry, not Mr. Nyman. Even people in my own family mispronounce it, so no worries. I'm here for the Appellant 21st Mortgage, and I'd like to reserve three minutes of my time for rebuttal, if I may. Okay. Thank you, Judge Thomas, and may it please the Court. The lower court's rulings are contrary to all three of the key sources of governing legal rules in this context. First, the language of the security interest documents. Second, the web of California and San Jose laws regulating the ownership of homes in mobile home parks of this sort. And third, Section 506 of the Bankruptcy Code is authoritatively Do you agree, do you not, that under California law, which governs, a security interest is enforceable against the debtor with respect to the collateral only if the debtor has signed a security agreement that provides a description of the collateral, yes? Yes. So let's talk about what the security agreement says here. Yes. So it says that the collateral is the mobile home and its attachments, accessories, replacements, and additions. It doesn't say anything about the land on which the mobile home resides. I respectfully disagree, Judge Rakoff. The security agreement itself refers to the precise address where this home will be located within the Mountain Shadows Park and, more importantly, the document that records the security interest with the State. The title here specifically lists the situs right down to the street address, 631 Shady Creek Drive in San Jose. So if that language Doesn't the security agreement also state that the manufactured home, notwithstanding the address, is, quote, personal property and that the hazes are prohibited from, quote, allowing it to become part of the real estate or to lose its status as personal property? That is correct, and to be clear, we are not claiming any security interest in any real estate here. We are claiming an interest in the personal property, i.e., this mobile home and all the rights that form the bundle of sticks that are part of the property interest in the home in the situs. The reason why the security interest documents specifically refer to the situs is that California law, the California law governing mobile home residency, creates a crucial connection and relationship between the mobile home on the one hand and the situs on which it is located so long as the person owns the mobile home on that situs. California law does two things in that regard. First, it anchors the mobile home to the situs. Section 18099.5 of the Health and Safety Code says that the person who purchases the home on the situs cannot move the home from the situs, that the landlord, the mobile home, the mobile park owner cannot move the land or move the home from the situs, not without permission of the creditor during the course of the loan. There's a similar provision in the security interest agreement. Those provisions ensure that during the life of the loan, the home will stay put on that situs, and that means that the home will retain all the value that is associated with being at that situs. Counsel, do you have any cases that support that position? That support your position, that that's the reading that we should give to Health and Safety Code, that you have both right to the mobile home, which is explicitly stated in your security agreement, and that we should implicitly read into that that you also have a right to the site? To be clear, I'm not — we are not arguing that there's a right to the site. But what we are arguing — and my best case is really not a case. It's the California mobile home residency law, because in addition to anchoring — So it's your client who drafted the security agreement, right? Yes, Your Honor. And so they could have made explicitly clear that the value is determined in part by the situs as well as the value of the mobile home itself, but they didn't. The security interest documents here did everything they needed to do to extend the security interest to this home as located at the situs. They did so in part by virtue of the language that expressly mentions the situs, but they did so also in part because of the operation of California law. And to be clear, Judge Rakoff, I don't think that the Hayses would maintain that there is anything my clients could have done with respect to the security agreement that would have preserved that particular right. But my clients did preserve all rights associated with homeownership at the situs in part because of the other thing that California law does. California law, the California Mobile Home Residency Act, creates or it ties the — an automatic right to lease at a mobile home park to the ownership of the mobile home at that particular situs. My point is, would you agree that assuming arguendo that there is some ambiguity in the security agreement as to how it defines what's covered, that since your client drafted it, it should be read against your client? Well, I haven't seen the other side cite any law, whether on the federal level or on the State level, saying that ambiguities are construed against the creditor in these circumstances. I thought that was law school 101. Did I miss that? My more fundamental answer, Judge Rakoff, is that the language in the security interest agreement, the language in the title does everything it needs to do to extend to the full rights to this property, this mobile home property. And to be clear, there's been some suggestion on the other side that perhaps the security agreement could have specified the value that it encompasses. That's not how security interest agreements work. The language of the California Commercial Code says that security interests are to describe the collateral. It defines collateral as property. So the question here is what property did this security agreement extend to? And it extended to this mobile home at the situs. By virtue not only of the laws that anchor the mobile home to the situs during the course of the loan, but also to the California laws that create this automatic right to a lease at the mobile home park that attaches to the actual ownership of the home, nothing else. The district court suggested that perhaps the security interest agreement would have extended to the lease that the Hayes' have with Mountain Shadows, but due to the way that the California mobile home residency law works, there is no security interest in a lease of this sort that a creditor can take a security interest in. The Hayes' lease doesn't have value that they can either sell to someone else or pledge to a creditor in this kind of transaction, and the reason why is wrapped up in three consecutive provisions of the mobile home residency law. That's section 798.72, .73, and .74. The combined effect of those laws is to preclude park owners from selling leases to new owners. The effect of those laws requires mobile home park owners to grant leases to new owners, and it precludes them from forcing the owners of a mobile home within the park to remove the mobile home as a result of a sale of this sort. So all that ties the right to lease here contrary to the district court's suggestion that the right to lease could somehow be assigned by the debtors here to the actual ownership of the home. That means that the Hayes' can't ever sell this lease. If they ever sell their home, they won't transfer the lease to the buyer of the home. Instead, the buyers of the home will have an automatic right under California law to enter into their own lease with Mountain Shadows at that point in time. So the only security interest my clients could have taken here was in the home itself, which carries with it this right to lease, which in turn carries with it the value that is disputed here. That's the bundle of sticks that my clients secured when they entered into the security agreement that specifically provided that they would have an interest in this home and specified what the situs of the home would be. So there are really two questions the court has to answer here. The first concerns what we've been addressing thus far, i.e., what is the scope of the property that is within the security interest here? The secondary question is the one addressed by the Supreme Court in Rash as well as this court on Bonk. In the Sunny Slope case, what is the value of the property? How do you value the property here? Section 506A2 of the Bankruptcy Code pegs that value to the price that a retail merchant would charge for property of that kind. This standard for determining value is rooted in the realities of the use to which the debtor intends to put the property over the course of a bankruptcy like this one. So the fundamental question is what it would cost the debtor to purchase a property of this kind, which here would mean a property that is similarly anchored to a similar situs. In this market, when people buy mobile homes at places like Mountain Shadows, they aren't quoted one price for the quote-unquote box and another price for the lease. They simply are quoted a single price for the home in place. That's the inevitable result of the California mobile home residency provisions that we've been discussing. It's also what happened when the Hayses purchased this house. So the replacement cost under Section 506 is the in-place value of their home. In the real world, when mobile home buyers purchase mobile homes, they aren't paying $24,000 for boxes here. They're paying the $185,000 figure that the Hayses, in fact, extended for the purchase of this home. I see I'm cutting into my rebuttal time. I'll reserve that and yield the podium to my friend on the other side. Thank you. May it please the Court, I'm Norma Hammes, and I represent the appellees, Michael and Sharon Hayes, and their Chapter 13 debtors. This is their plan that we're arguing about right now. Well, as usual, there's very little I agreed with the other side about here, so just throw that in the mix. Basically, according to their disclosure statement, 21st Mortgage is a wholly owned subsidiary of Clayton Homes, Inc., which is a wholly owned subsidiary of Berkshire Hathaway, Inc. On the other hand, my clients are normal working people, or more accurately, the husband works, but the wife is disabled and unemployed. But we're not concerned, are we here, with the equities? We're concerned with what was secured, what was not secured, and what the value then is that follows, yes? That is absolutely correct. And the reason why this is relevant is because 21st, as a well-financed operation, strong-armed debtors, including our own, they attempted to hit cases all over the country trying to get the values of the mobile home boxes higher than the bankruptcy code provides for. So this is not a one-up here. This is all over the place. Although this is the first place that they ever, that I remember hearing them say that, well, I guess they did say... What they're saying, if I understood their argument, is that because California law ties the mobile home so closely to the property that it's residing on, that when you are securing, when you get a mortgage for the home, it's really a mortgage for the home broadly read as the home plus the location, and that the value of that is therefore much greater than the home itself. So what do you say to that argument? Yes, well, that is the argument they have been making all along, and it's not founded in the law at all. As we had briefed before, the fact that it is stated to be located at a particular address does not give, does not purport to give any kind of a security interest or anything else in that location. It's just, it's telling people, where is this mobile home going to be sitting? If you want to go look for it, to repossess it or whatever you're going to do, that's where it's going to be. And the other argument that they've made recently is that the proceeds provision in the contract gives them a right to get the pad. Well, they go back and forth as to whether the pad gives this enhanced value that they're claiming, or whether it's actually something that emanates from the box itself, which is completely magical. There's no basis in law at all for that. But that's something that they're saying now. Either one of those things is wrong. And the, if the point is going to be that, how can they expand in the future their security agreements to include this kind of enhanced interest? Basically, that's a problem that doesn't have to be solved. They can solve it themselves by exiting that market. If they don't want to make those loans that cannot be secured by what they want them to be secured by, just stop making those loans. They have a large portfolio of mobile home loans, and not all of them are 50 years old and worth $24,000. Most of them are much newer. And this kind of a situation would not arise in those cases, because the debtor, in order to be able to cram down a mobile home loan, you have to be able, the debtor has to be able to pay the full amount of the value through the plan within five years. So you can't have a $100,000 mobile home crammed, if that's the value of it, crammed into five years. That's just not going to be a feasible Chapter 13 plan. But in the case of my clients, it's over 50 years old, and it doesn't even meet the 1976 manufactured home standards. Contrary to what they actually wrote, supposing they had expressly said in the security agreement, the mortgage, the value of the property of the mobile home that secures this mortgage will be determined by its value based on the location where it resides, or something like that, and the location cannot be changed. If they had said that, you would not be able to argue then that the value was less than they're claiming, would you? Well, I'm not clear about what you said. If the contract says, you said the pad or the lot has some value, did you say that? No, I'm saying supposing they said, which they didn't, but supposing they said in the mortgage, this mortgage, the property which it secures is the mobile home, but the value of the mobile home will be a function, not just of what is its value as a piece of equipment, but also of its location. Well, I think the problem there would be that you can't just determine that something has a particular value if the thing that you're trying to value is not actually security, legal security for that interest. I mean, if it's not, then you can say the mobile home parks residential, the community building is worth $3 million. It's not a part of the security agreement. It's not under state law. It's not security for it. Same thing would happen there. Just stating a value if it's not actual security doesn't make it so. Okay. Okay. And so actually, so this is bringing me around to the point of what would happen if this court does hold in favor of 21st? And I think we're getting around the edges of it. It's not necessarily that the decision would be limited to effect in bankruptcy. It could in fact spill over and affect security agreements under state laws and state laws intimately involved in this whole question. Recorded or filed security interests would no longer reliably provide public notice of the scope of perfected security interests, particularly what specific items are security for the creditor's debt. So for example, here regarding the mobile home, under state law, there is a registration paper filed with the State Department of Housing and Community Development. That's the method of recording and perfecting that security interest. And so if something other than what is shown in the public record as the security is really also security, then all of a sudden your whole notice and recording system starts getting crazy. Because it's kind of like what the parties ahead of us were dealing with in terms of if you don't have it right in the contract, but you're supposed to know that something else is applicable. It's the same thing here. You're supposed to be able to rely on what is recorded in either the recorder's offices in California, if it's real property, or the Secretary of State, if it's other personal property, or the Housing and Community Development Department if it's mobile homes. And that is something that would be really, really damaged by a decision in favor of 21st. Let's see. I think basically one of the problems that I had in reading the briefs is that there were so many errors, misstatements, actually misstatements of code sections. It was just like within sentences I was getting mental whiplash. And basically I think we all have to come back to the real question is do they have any statutory authority for their position? No. Do they have any precedential case law? No, they don't have that either. They have basically nothing to support their position. And in the end, you also have to ask, is the thing that they are producing as a value, does that qualify as the price a retail merchant would charge for the item? No, it wouldn't, because the retail merchant would not be selling any magical, extraneous, wonderful, enhanced value to the box. They would be selling the item that is the security for 21st mortgage. And that's the thing that has a retail value. Let me ask this, counsel, because I'm trying to follow your train of thought here. In order for 21st mortgage to protect itself in the future, let's just pretend we agree with you here, when they make these loans to mortgagers, is the prudent thing for them to do then only to loan the value of the box, so to speak? So in this example, your client should have only received a mortgage of $24,000 instead of $177,000 or so? Yeah, I agree with that. But here's the other thing, is that most of the people who buy mobile homes that are old and of that value, they don't file bankruptcy. There's only a very small percentage that do. So that's the reason why 21st is still in the business, because most of those loans do actually pay off. And, you know, bankruptcy is one of the fundamental safety nets that we have in this country. My further question to that then is, and I'm not sure it even matters for purposes of determining this case, but I'm now curious, if they were to do that, would someone like your clients be able to even purchase this home? So let's say they just mortgage or, you know, give them a mortgage or, excuse me, loan them the amount of the box, the $24,000. Is that going to be sufficient for your clients to be able to get the box, given that the site is much more expensive? Yeah, I mean, it's true. They wouldn't have been able to purchase it. There's no question about it. But there are some subprime lenders out there. 21st is not the only one. It's the big one. It's the really big one. But they'll take it on a bet that it's not going to go into bankruptcy. Because what we're talking about here is not new law. This has been around for years and years and years. And it's not a surprise to 21st. They know all about this. They litigated this all over the country. And they basically lose. By the way, Glenn, they lost. I don't know why they keep saying they won it. It's just crazy. But the Fifth Circuit and Glenn, it's tangential to our issue here, but it's not, it's definitely related. And they lost that. It's crazy. It just makes me nuts. Let's see. So, yeah, basically, that's, I think I'm running down here. But basically, just back to, ask yourself, is this a value? Is this a value that a retail merchant, and is there a retail merchant for anything except the box that we're talking about? No, there isn't. Is there a value that a retail merchant for the box would charge a buyer? What is that value? And are they getting that value? That's the question. They're not. Anyway, thank you. Thank you very much. All right. Thank you. Two aspects of the argument made by my friend on the other side are extraordinarily telling. First, in response to Judge Rakoff's question, the Hayses have taken no position or have suggested that there was nothing 21st could have done in the security agreement to capture the full amount of the loan that they extended for the purchase of this home. Second, in response to Judge D'Alba's questions, counsel suggested that the only amount of credit that 21st or any lender in these circumstances could extend was the, quote-unquote, box value of $24,000, which would not be enough to enable anyone in these parks to purchase these homes. If those are the positions of the Hayses on these issues, it's a good sign that they're wrong about the core black-letter law principles here, both with respect to what the property interest here is that is on the slope. Both of those inquiries require the court to consider the realities of the situation, the actual use by the debtor. So let's return to the realities here. The Hayses purchased this home not for $24,000, but for $185,000. They needed a loan from my client of $177,000 to purchase the home. Why did they need that much? And to be clear, that was for the purchase of the home. There was nothing else purchased. There was no separate lease purchased with that amount. There was no real property purchased with that amount. The $185,000 was what was necessary. Why was that necessary? Because of the close tie that California mobile home residency laws create between the home and the situs on which it's located. The laws anchor the home at that situs, and then they create value in the home at the situs. That value or the interest in that property is captured by a security agreement like the one we have here, one that specifies that the security is taken in the home and that the home has a particular situs. A security agreement does not need to specify that every single right that would be associated with the bundle of sticks in the home, every home carries with it the right to go to public schools in the area. No one would say that a security agreement has to specify that the creditor is taking a right, taking an interest in the right to go to public schools, even though that right may be extraordinarily valuable. The same principle applies here. Under Sunny Slope, under Section 506, the Court is to ask what would retail merchant charge for property of this kind. Retail merchants are selling property of this kind in mobile home parks. They're selling it for the amounts that Hayes has paid for this home here in order to preserve everyone's equity in these markets, including current homeowners, and preserve the ability of future homeowners to purchase homes in these parks. This Court should reverse that. I'm not totally sure I'm following your analogy to a mortgage on a home. So you purchase a home, and the property in that neighborhood at that time is very high. So you get a mortgage for a million dollars, and it's secured by the home. And then, lo and behold, you go into bankruptcy, and the mortgage document says that the security is the home. But by that time, the neighborhood has changed, and the property is worth one-tenth of what it was when it was purchased. The security would be the new value of the home, right? The lesser value. No doubt, Judge Rakoff. That's because the analysis focuses on the realities. And if we were in a situation where the value of a home in this particular situs had diminished substantially, then 21st would be left with substantially less — with collateral that was substantially less valuable. But those are not the realities here. The evidence in the case suggests that homes continue to sell for not just the amount that the Hayeses paid for this home at Mountain Shadows, but, in fact, more now. So what the Hayeses are trying to do is to say, don't look at the realities. Pretend that this property is something other than it is. Pretend that it's not in this place, and there's no value in this place. But that's not what Section 506 calls for. That's not what Sunny Slope calls for. I know your time is up, but I do want to follow up on that really quickly. So let me kind of make sure I understand what you're telling us. If, for example, they find that it's a Superfund site, right, underneath the mobile home, so you go from having a mobile home with location valued from $270,000 to $20,000 because people no longer should be living on it, 21 Mortgage takes that hit? Yes, absolutely, because the value of the home is tied irrevocably under California law to the situs. So if it turns out that the situs to which the home is irrevocably tied for these purposes has negative value, then that affects the value of 21st Collateral. But at the end of the day —  Let me ask you this. But does it affect the value of the box? So let's say, because it's mobile, this is a home that can be picked up and moved, and it was worth $24,000. What would you be going after the hazes for? Would it be the $24,000, or would it be the value of the entire area because of its location is at $20,000 or $10,000? Section 506 requires the court to ask, what would a retail merchant charge for a property of that kind? In your hypothetical, the retail merchant, because that — because the home would be tied to the situs, likely wouldn't be able to sell that home at all. If there's —  It could be zero. It could be zero, yes. You're not arguing for some kind of one-way ratchet that only benefits you when the property value goes down. Yes. That's correct. I mean, we are tied to the home as located at the situs for good or for bad for us. But the point is the property at issue, the property that is secured by virtue of these California mobile home residency laws that protect debtors, protect owners, and protect creditors, we are — the value of the home at the situs is what 506 ends up requiring the court to assess in terms of the cram-down procedure. Any more questions? No more questions. Okay. Thank you very much. Thank you. Okay. We thank both counsel for their arguments this morning. This case is now submitted. The court is adjourned for this session.
judges: THOMAS, ALBA, Rakoff